WILLIAM C. BRASHEAR, PLAINTIFF IN ERROR, *v.* JOHN Y. MASON, SECRETARY OF THE NAVY, DEFENDANT.

Under the joint resolutions of Congress, providing for the annexation of Texas to the United States, the officers of the navy of Texas did not pass into the naval service of the United States. The transfer of the navy of Texas related exclusively to the ships of war and their armaments.

A mandamus against the Secretary of the Navy will not lie at the instance of an officer to enforce the payment of his pay.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the District of Columbia, holden in and for the county of Washington.

It was an application to the Circuit Court for a mandamus, under circumstances which are thus stated by that court in its opinion.

William C. Brashear petitioned the court for a rule on John Y. Mason, Secretary of the Navy of the United States, to show cause why a mandamus should not issue, commanding him, as Secretary of the Department of the Navy, to cause payment to the petitioner of his just dues as an officer in the navy for the time past since the annexation of Texas to the United States.

The petitioner states, that, in pursuance of the constitution and laws of the republic of Texas, he was, on the 23d of June, 1845, by the then president of the said republic, commissioned as a commander in the navy of the republic, and forthwith entered into service under orders from the department of war in Texas; and continued in that service from the 23d of September, 1844, thenceforth, and was so in service when the joint resolution of the Congress of the United States passed for annexing Texas to the United States was approved, and when the said State of Texas was admitted into the Union and Confederacy of the United States of America, and was actually in service and a commander in the navy of Texas when the ship Austin, brigs Wharton and Archer, and schooner San Bernard, armed vessels of war of and belonging to the Texan navy, were delivered over to the United States, under the terms and articles of compact and agreement between the United States of America and the republic of Texas; and as such he is advised that he is in good faith, and in accordance with the said articles of agreement, compact, and treaty of annexation, an officer in the navy, and entitled to his pay and emoluments from the United States.

The petitioner further states, that he never has resigned his commission, nor been cashiered, nor dismissed; that he has regularly reported himself for duty under the said commission

to the Secretary of the Navy of the United States, and has demanded his pay as an officer, but the Secretary of the Navy of the United States has hitherto refused, and yet refuses, to pay him, or to recognize him as an officer of the navy. He states further, that he is informed and advised by counsel learned in the law, that for his pay and emoluments as an officer of the navy of Texas, *transferred* to the United States by the terms of the annexation aforesaid, he is entitled to have and receive, up to the 1st of October, 1847, the sum of $2,100; whereof he has received from the treasury of the United States no more than the sum of $689.20, which was paid him by order of the Secretary of the Navy of the 19th of March, 1847. And he is also advised, that he is entitled to his continuing pay and rank as an officer in the navy of the United States, by virtue of the said agreement, compact, treaty, and *transfer* before mentioned.

Notwithstanding all which, the Secretary of the Navy of the United States refuses to order payment to him for the time past since the said annexation and transfer, or to recognize him as an officer in the navy of the United States.

That part of the second section of the joint resolution of the 1st March, 1845, for annexing Texas to the United States, which is applicable to this case, is in the following words: —

" Said State, when admitted into the Union, after ceding to the United States all public edifices, fortifications, barracks, ports and harbours, navy and navy-yards, docks, magazines, arms, armaments, and all other property and means pertaining to the public defence, belonging to said republic of Texas, shall retain all the public funds, debts, taxes, and dues of every kind, which may belong to, or may be due and owing, said republic; and shall also retain all the vacant and unappropriated lands lying within its limits, to be applied to the payment of the debts and liabilities of the said republic of Texas; and the residue of said lands, after discharging the said debts and liabilities, to be disposed of as the said State may direct; but in no event are said debts and liabilities to become a charge upon the government of the United States."

The Circuit Court overruled the motion for a mandamus, and rejected the prayer of the petition, to which judgment Brashear excepted, and upon this exception the case came up to this court.

It was argued by *Mr. Bibb* and *Mr. Jones,* for the plaintiff in error, and by *Mr. Clifford* (Attorney-General), for the Secretary of the Navy.

A portion of the argument on behalf of the plaintiff in error was as follows.

Whether the applicant has a right to the money which he demands by his petition and motion depends upon the proper meaning and effect of that part of the convention for annexation and union which relates to the cession by Texas of her " navy," and the acceptance thereof by the United States.

The proposition flowed from the United States to Texas. Texas accepted, and made the cession and delivery, in compliance with her sense of the proposition ; and the United States accepted.

The first question is, What is the sense in which this condition was presented by the United States, and the sense in which Texas accepted ?

This may be solved by considering, first, the meaning of the word " navy," as established by general use ; second, by the circumstances of the parties proposing and accepting ; third, by the conduct of the parties in acting under the convention immediately after it was ratified.

1. As to the meaning established by use, "navy" is a mixed mode of speech, a complex idea, including the insensible, inert matter whereof the vessels of war are composed ; also the armaments and equipments ; and also the active, living bodies and minds necessary to give mobility, direction, utility, and efficiency to the *vis inertiæ* of the vessels and armaments.

Inanimate matter cannot think, plan, protect, drive off, pursue, blockade, and give safe convoy. Officers and sailors are indispensably necessary to make a navy.

The idea of a navy composed solely of vessels and guns, without officers and seamen, is as absurd as the idea of an army composed solely of muskets, swords, pistols, and big guns, without officers and soldiers to wield them.

The law of the United States entitled " An act for the better government of the navy of the United States " (2 Statutes at Large, 45), contains forty-two articles to rule and govern the officers and privates in the navy of the United States, which is an authoritative definition, not to be gainsaid, that officers and privates are component parts of a navy. The law of the navy is to govern the officers and the privates who compose the navy, not to govern ships and guns, that cannot offend nor commit crimes, nor be the subjects of accusation before naval courts-martial.

2. As to the circumstances of the parties proposing the cession and making the cession of the navy and navy-yards, docks, ports, and harbours, the United States, by their Constitution, had power " to provide and maintain a navy " ; their situation, interests, and duties imperiously demanded the execution of that power. The State of Texas, if admitted into

the Union, could no longer keep ships of war in time of peace without the consent of Congress; and yet a navy would be essential to guard and protect the coasts and harbours of Texas after the union, as it had been before the proposed conditions and guarantees for the union. The people and government of Texas could not, did not, understand the proposal to cede the navy to the United States as intended to destroy it, any more than that the proposal to cede the ports and harbours was intended by the United States for the purpose of obstructing or rendering them useless. The natural sense in which they were presented, understood, and accepted was, that the navy, ports, and harbours were to be maintained, preserved, and used for their several and appropriate purposes.

But the circumstances under which the people and government of Texas were, in relation to their navy, so well known to public history and to fame, forbid the idea that the United States intended the proposal, or that Texas would have acceded to it, as containing a violation of the obligations due to the officers of the navy, who had so repeatedly, so gallantly, so gloriously, and so usefully fought the enemies of Texas, beat off the foes who came to invade, pursued them into their own ports and harbours, there blockaded them, and levied contributions to assist the means of Texas in their war of independence. The many naval battles between the vessels of war of Texas and those of Mexico, in the year 1836, and after, in which the navy of Texas fought against the very superior force of the Mexicans, always sustaining the honor of the flag, and adding new brilliancy to the lone star, were just foundations of national pride, as well as of national gratitude towards the navy. The belief, that, by the proposal for ceding the navy of Texas to the United States, the officers would have been deprived of their commissions and pay in the navy so transferred, turned adrift to seek a precarious subsistence in some other calling, for which their long and gallant services in the navy of Texas had unfitted them, would of itself have been cause for rejecting the proposal on the part of Texas. Such fell ingratitude would have tarnished the escutcheon of Texas. The words of the proposal, the circumstances of the parties to the convention, the end proposed, left no ground for suspicion, that such an act of injustice and ingratitude to the officers of the navy was concealed in the proposal made by the United States.

3. The conduct of the parties in acting under the convention immediately after it was ratified. — The government of Texas issued an order to the commander of the navy for delivery to the United States; the United States received the navy

officers, privates, and vessels, and kept them in service and pay for the time shown in the petition and the documents. Texas had no standing army, nor officers of a regular army upon permanent establishment. She had some companies of rangers enlisted as volunteers for the limited period of three months, not expired when Texas was admitted into the Union. These rangers, with the noted gallant Major Jack Hays at their head, were turned over to the command of General Taylor, served out the time for which they had been enrolled, and performed under his command eminent services well known to fame.

Such were the actings and doings by the parties to this convention, when the mutual sense of its meaning was fresh in memory, and the faith of the treaty prevailed.

The word "navy," as used in the Constitution of the United States, has never been supposed by any one to mean ships only. By established usage, and by various acts of Congress, "navy" comprehends both ships and men.

There is nothing in the convention itself, nor in the circumstances attending the parties, nor in the end proposed, which requires that the terms of the convention should be understood in a confined, restrictive sense. On the contrary, all the circumstances unite in requiring the expressions to be taken in the most extensive sense. For surely the authors of the proposal, and the party accepting it, did use the word "navy" in its extensive sense, because it was applied to the existing navy of Texas, known to be armed, officered, and manned; known to have gloriously fought the battles of Texas, and kept in check the naval power of Mexico, which nation had not then acknowledged the independence of Texas, but kept up the threat to subdue the spirit of the revolted province and subject it to the Mexican power.

The counsel for the plaintiff in error then proceeded to show, from several other considerations, that the word "navy" must be construed to include officers and men.

*Mr. Clifford* (Attorney-General), *contra,*

There are several views of this question, either of which, as it seems to me, is conclusive against him. He claims pay as an officer of the United States navy.

It is contended that the joint resolution of March, 1845, makes him such officer. The construction contended for by the petitioner is founded entirely on the meaning which he puts upon the word "navy," which in my judgment is entirely erroneous, and cannot be sustained. The resolution contained the terms of a compact between two sovereign and independent States, and by its second condition clearly contem-

plated nothing more than an agreement as to the public property, means, resources, and liabilities of Texas. It was the *public property*, and that alone, which was embraced in that provision. Texas was to retain certain public property, and meet her own liabilities; all the residue of her means of public or national defence was to be "*ceded*" to the United States, — a term of grant evidently applicable to *property* and not to *persons*. No ingenuity can change the obvious meaning and sense of a law so plainly written.

The condition, it will be observed, is confined to acts to be done by Texas, and not to duties to be assumed by the United States. Texas binds herself, by acceding to the terms of the resolution, to cede her navy and other public property. The petitioner held a commission under Texas, and had taken the oath of allegiance to her. This did not establish any such relation between the officer and the government as authorized the government to transfer him to the United States, into official responsibilities to which he had not assented, and to which his commission did not bind him. Still less can the United States be held to have taken him into their service by that condition, which imposed on them no duties. The construction contended for would be placing the United States in the attitude of proposing impossible conditions to the government of Texas, for how could Texas cede the services of her citizens?

By a proviso in the naval appropriation act of 4th August, 1842 (5 Statutes at Large, 500), it is declared, "That, until otherwise ordered by Congress, the officers of the navy shall not be increased beyond the number in the respective grades that were in the service on the 1st day of January, 1842." The construction contended for is inconsistent with this provision of law, and no implication arising under the resolution of March, 1845, can be held as repealing it. This test as to the intention of Congress is conclusive.

But, further, the construction contended for is wholly inconsistent with the power of appointment, which, by the Constitution, is vested in the President, by and with the advice and consent of the Senate. It is unnecessary to consider any of the qualifications annexed to that provision of the Constitution, as it is very certain they can have no application to the present case. It will not be disputed, that officers in the navy of the United States, under existing laws, must be appointed and commissioned by the President.

Congress has no power, either by treaty or by act of ordinary legislation, to abrogate this constitutional provision. It is presumed no authority can be found for the pretension, that

Congress can supersede the necessity of an appointment by the President, by and with the advice and consent of the Senate, in order to constitute an officer in the navy of the United States; and certainly no person can be entitled to pay as such, without a commission from the President, under the existing laws. Such a proposition, so subversive of the Constitution, cannot be seriously entertained.

What was the remedy sought by the petitioner? It was, that the Circuit Court should issue a writ of mandamus, directing the Secretary of the Navy to pay a sum of money to the petitioner, which he alleges is due to him as an officer of the United States navy. At all times this remedy is used by the court with extreme caution, and never in a doubtful case; and only to compel the performance of a mere ministerial act, or to do some specific thing enjoined by law, in which the party has no discretion. Surely this is not a case in which this power of the court should be exercised.

The petitioner has mistaken his remedy. Congress appropriates money for the pay of officers and men of the United States navy; and the right of an officer to pay attaches as a necessary consequence to the rank conferred by his commission. Has he established his rank? Certainly not.

But even if he has established his rank, the Secretary of the Navy can neither pay him nor withhold his pay; that is a question for the accounting officers of the treasury, over whom, in this respect, the navy department can assume no control. The sum stated by the petitioner as received by order of the Secretary of the Navy was paid out of the contingent fund of the department for services rendered by the petitioner, which might have been performed by any citizen holding no commission in the navy. That fund is not chargeable with the pay of officers and men, as is too well known to require any reference to the law. The appropriation for pay is under the general superintendence of the Secretary of the Treasury, and no account for such pay can be allowed until it shall have been passed by the accounting officers in the last-named department. The sum paid to the petitioner was for *services rendered* in taking charge of the property of the United States, and not as being due him as an officer. The petitioner's account as presented shows this. The Secretary of the Navy expressly refused to recognize the petitioner as an officer of the navy of the United States. See Secretary's letter.

The reasons assigned by the Circuit Court for refusing the rule are so entirely satisfactory and conclusive, in the view which I take of the question, that I deem it wholly unnecessary to pursue the argument, and have only to append a copy

of that opinion for the consideration of the court, and to ask their attention to the fact, which appears by the record, that Brashear's commission in the Texas navy bears date *subsequent* to the passage of the joint resolution of Congress.

Mr. Justice NELSON delivered the opinion of the court.

This is a writ of error to the Circuit Court held in and for the District of Columbia.

The plaintiff made application to the court below for a mandamus against the defendant, to compel the payment of $2100 arrearages of pay due him from the government as a commander in the navy of the United States, which application was founded on the following state of facts.

The plaintiff was appointed a commander in the navy of the republic of Texas on the 23d of September, 1844, and continued in its service down to the annexation of the republic to the United States, in pursuance of the joint resolutions of Congress, March 1, 1845, and until Texas was admitted into the Union as one of the States of the confederacy, and was in the actual service of that republic at the time when its navy, consisting of four vessels of war, was delivered over to the authorities of the United States, according to the terms of annexation.

The plaintiff insists, that, according to the terms and conditions of the compact between the two countries, on the transfer of the navy of Texas to the United States, and their acceptance of the same, he became an officer of the United States navy, and entitled to his pay and emoluments as such.

He further states, that he had reported himself to the Secretary of the Navy for duty, and had demanded his pay of the same; but that the Secretary had refused to recognize him as an officer of the navy, or to make any payment to him as such.

The court below refused the mandamus, and dismissed the application.

The case is now before us for review.

It is not pretended that there has been any stipulation, either by act of Congress or by treaty between this government and Texas, by which the officers of her navy were to become incorporated into the navy of the United States, as a consequence of the annexation; but it is supposed to result from a proper construction and understanding of one of the stipulations contained in the second joint resolution of March 1, 1845. The part material is as follows : —

" Said State (Texas), when admitted into the Union, after ceding to the United States all public edifices, fortifications, barracks, ports and harbours, navy and navy-yards, docks, mag-

azines, arms, armaments, and all other property and means pertaining to the public defence belonging to Texas, shall retain all the public funds," &c.    (5 Statutes at Large, p. 797.)

The argument is, that the term "navy" properly includes, not only the vessels of war, their armaments and equipments, but also the usual complement of officers and crew on board the respective vessels; and that it is in this sense the term is used, and should be understood, in the joint resolutions.

We think not, but, on the contrary, are of opinion that it relates exclusively to the ships of war and their armaments belonging to the naval establishment of Texas, which, according to the compact, were to become the property of the United States.

The two governments were not negotiating about persons holding public employments in Texas, or in respect to any place or provision for that class, on the breaking up of the old government and its reconstruction for admission into the Union, but in respect to her public property, which she was, generally, disabled from holding, under the Constitution of the United States, after her admission, as it fell under the jurisdiction and direction of the federal government.

The resolution provides for ceding to the United States all public edifices, fortifications, barracks, ports and harbours, navy and navy-yards, docks, magazines, &c., and all other property and means pertaining to the public defence.

The phraseology is appropriate for the purpose of conveying the property of the one government to the other, but exceedingly inapt and unfortunate if intended to embrace persons or public officers, as contended for by the plaintiff.

The argument in favor of including the officers of the navy of Texas in the transfer of the ships might be urged with equal force by the officers and hands in charge of the navy-yard, or of those at the time in charge of the fortifications; for the term "navy," in the connection in which it is used, no more includes, *ex vi termini*, the officers and crew on board, than the term "navy yard" includes the officers and hands in charge of that part of the public property, or the term "fortifications" includes the officers and soldiers of the republic engaged in manning them.

The construction contended for we think altogether inadmissible, and properly rejected by the court below.

We are also of opinion, that if the plaintiff had made out a title to his pay as an officer of the United States navy, a mandamus would not lie in the court below to enforce the payment.

The Constitution provides, that no money shall be drawn from the treasury but in consequence of appropriations made

by law. (Art. I. § 9.) And it is declared by act of Congress (3 Statutes at Large, p. 689, § 3), that all moneys appropriated for the use of the war and navy departments shall be drawn from the treasury by warrants of the Secretary of the Treasury, upon the requisitions of the Secretaries of these departments, countersigned by the second comptroller.

And, by the act of 1817 (3 Statutes at Large, p. 367, §§ 8, 9), it is made the duty of the comptrollers to countersign the warrants only in cases when they shall be warranted by law. And all warrants drawn by the Secretary of the Treasury upon the treasurer shall specify the particular appropriations to which the same shall be charged; and the moneys paid by virtue of such warrants shall, in conformity therewith, be charged to such appropriations in the books kept by the comptrollers; and the sums appropriated for each branch of expenditure in the several departments shall be solely applied to the object for which they are respectively appropriated, and no others. (2 Statutes at Large, p. 535, § 1.)

Formerly, the moneys appropriated for the war and navy departments were placed in the treasury to the credit of the respective secretaries. That practice has been changed, and all the moneys in the treasury are in to the credit or in the custody of the treasurers, and can be drawn out, as we have seen, only on the warrant of the Secretary of the Treasury, countersigned by the comptroller.

In the case of Mrs. Decatur v. Paulding (14 Peters, 497), it was held by this court that a mandamus would not lie from the Circuit Court of this District to the Secretary of the Navy to compel him to pay to the plaintiff a sum of money claimed to be due her as a pension under a resolution of Congress. There was no question as to the amount due, if the plaintiff was properly entitled to the pension; and it was made to appear, in that case, affirmatively, on the application, that the pension fund was ample to satisfy the claim. The fund, also, was under the control of the Secretary, and the moneys payable on his own warrant.

Still the court refused to inquire into the merits of the claim of Mrs. D. to the pension, or to determine whether it was rightfully withheld or not by the Secretary, on the ground that the court below had no jurisdiction over the case, and, therefore, the question not properly before this court on the writ of error.

The court say, that the duty required of the Secretary by the resolution was to be performed by him as the head of one of the executive departments of the government, in the ordinary discharge of his official duties; that, in general, such

9 *

duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties; that the head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion; and that the court could not by mandamus act directly upon the officer, and guide and control his judgment or discretion in matters committed to his care in the ordinary discharge of his official duties.

The court distinguish the case from Kendall v. The United States (12 Peters, 524), where there was a mandamus to enforce the performance of a mere ministerial act, not involving, on the part of the officer, the exercise of any judgment or discretion.

The principle of the case of Mrs. Decatur is decisive of the present one. The facts here are much stronger to illustrate the inconvenience and unfitness of the remedy.

Besides the duty of inquiring into and ascertaining the rate of compensation that may be due to the officers, under the laws of Congress, no payment can be made unless there has been an appropriation for the purpose. And if made, it may have become already exhausted, or prior requisitions may have been issued sufficient to exhaust it.

The Secretary is obliged to inquire into the condition of the fund, and the claims already charged upon it, in order to ascertain if there is money enough to pay all the accruing demands, and if not enough, how it shall be apportioned among the parties entitled to it.

These are important duties, calling for the exercise of judgment and discretion on the part of the officer, and in which the general creditors of the government, to the payment of whose demands the particular fund is applicable, are interested, as well as the government itself. At most, the Secretary is but a trustee of the fund for the benefit of all those who have claims chargeable upon it, and, like other trustees, is bound to administer it with a view to the rights and interests of all concerned.

It will not do to say, that the result of the proceeding by mandamus would show the title of the relator to his pay, the amount, and whether there were any moneys in the treasury applicable to the demand; for, upon this ground, any creditor of the government would be enabled to enforce his claim against it, through the head of the proper department, by means of this writ, and the proceeding by mandamus would become as common, in the enforcement of demands upon the government, as the action of assumpsit to enforce like demands against individuals.

For these reasons, we think the writ of mandamus would

not lie in the case, and therefore, also, properly refused by the court below, and that the judgment should be affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the county of Washington, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be and the same is hereby affirmed.