Hugh McD. McElrath

*vs.*

Betsey McIntosh, John H. Eaton, of Washington, D. C., The Secretary of the Treasury, and the Second Comptroller, U. S. Treasury.

In Equity. Decided November 21, 1848.

*For an Injunction to prevent Betsey McIntosh from receiving, and the Secretary of the Treasury and the Second Comptroller from paying her more than one-half of her claim awarded under the Cherokee Treaties.*

1. The Courts of the United States have no authority to enjoin the officers of the Government against performing any merely ministerial act, nor interfere in any way to guide or control the executive officers of the Government, or to entertain any appeal from their decisions.

2. The Court has no authority to cause a writ of *mandamus* to issue to the Secretary to cause a credit to be entered on the books of the Department when there is no general law requiring such a credit to be entered.

3. The Court has no authority to cause the amount of such credit to be paid when there has been no specific appropriation.

4. The question whether a power of attorney from an Indian woman to another person to recover the amount due to said Indian woman upon a land reservation (agreeably to the Indian treaties), and to retain half the amount recovered as a compensation, is so far contrary to the resolution of March 14th, 1848, as to justify the officers of the Treasury Department in refusing to pay the amount recovered, or any part of it, to such attorney, and the question whether such power of attorney be duly executed, are questions to be decided according to the discretion of the respective officers of the Treasury.

Geo. M. Bibb for the complainant.

R. H. Gillet for the defendants, Secretary of the Treasury, Second Comptroller *et al.*

The case is as follows :

Under the provisions of certain treaties with the Cherokees, Betsey McIntosh became entitled, under an award dated May, 1847, to receive $7,680, for the payment of which an appropriation was made by the joint resolution of March 14th, 1848. Eaton, as the substitute of McElrath, presents at the Treasury a power of attorney from Betsey McIntosh, in its terms irrevocable, which promises him 50 per cent. on what he shall collect, and by virtue thereof

demands the money appropriated. One-fifth of the sum is paid to him to remumerate him for his services as estimated by the War Department, and the residue is withheld. The Secretary of War says he shall, through the Cherokee Indian Agent, pay the residue to Betsey at her residence in the Indian country. He also alleges that his power of attorney has not been executed in the manner and at the time required by the Act of July 29, 1846, as it bears date prior to the appropriation and is neither in the form nor certified as therein provided. To this, Eaton answers that the power is coupled with an interest equivalent to an assignment of one-half the claim. The Secretary replied that if this is true, which is not admitted, the fact does not change his line of duty under the statute and the regulations which the President has established for his guidance and the guidance of those subordinate to him. He decides that he will pay the residue to no one but Betsey McIntosh, through the Indian Agent appointed to attend to the interests of the Cherokees in the Indian country. To this decision McElrath objects, and has filed his bill to prevent such payment to the Indian woman, and to compel the delivery of at least one-half of the amount of said claim to him, and asks this Court to grant an injunction to prevent any payment until the final determination of the Court.

Upon filing the bill, GEO. M. BIBB, for complainant, moved for an injunction as prayed in the bill, and contended:

1st. That the power of attorney from Betsey McIntosh to McElrath, being coupled with an interest, is an assignment of one-half of her claim, and was a contract which the United States ought to recognize. That as to one-half of the claim, it was money received by the United States for the use of the complainant. It was his money held by them in trust for him.

2d. That it was a specific lien which followed the fund into the hands of the United States.

3d. That the Secretary of War had no authority to make the rule respecting the payment of money to the attorney

of Indians, who have a right to appoint their own attorney. That the power was given before the order of October 1, 1846, and could not be controlled by it.

4th. That Betsey McIntosh is a white woman, not an Indian, and that she is, therefore, not within the terms of the order.

5th. That this Court has jurisdiction to compel an executive officer of the Government to perform any act which it is his duty to perform, if it be merely a ministerial act, not an executive act appertaining to the duties of his office as an executive officer; and that the act of paying this money to the complainant is a purely ministerial act, which the official character of the defendant will not exempt him from the duty of performing.

Ransom H. Gillett, Solicitor of the Treasury, for the defendants, the officers of the Government:

In the case before the Court, the question is simply this: the executive branch of the Government has decided that the faithful execution of the law requires that the money appropriated for this claim shall be paid directly to Betsey McIntosh and not to the claimant under the power of attorney; and this Court is asked to grant an order prohibiting such payment. The power and jurisdiction of the Court over the matter are denied *in toto.*

1. This Court has no jurisdiction beyond what has been conferred upon it by statute. These statutes are the 13th and 14th sections of the Judiciary Act, Stats. at Large, Vol. 1, pp. 80, 81, 82, the 11th section of Judiciary Act of Feb. 13, 1801, *idem*, Vol. 2, p. 98, so far as that section is not repealed; the 1st, 3d and 5th sections of the Act of February 27, 1801, *idem*, pp. 103, 105, 106, establishing this Court. See 1 Kent's Com., 6th ed., 339, and cases there cited; 1 Gall., 488 ;[1] 2 Dall., 384.[2]

2. The writs expressly authorized by the judiciary acts are such, and only such, as are necessary to carry out the

---

[1] The U. S. *vs.* Coolidge *et al.*    [2] The U. S. *vs.* Worrall.

jurisdiction conferred upon the Court by those statutes agreeable to the principles and usages of law. McIntre *vs.* Wood (7 Cr., 504); Smith *vs.* Jackson (Paine's C. C., 453); McClung *vs.* Silliman (6 Wheat., 598); 1 Kent's Com., 322; Bouvier's Law Dict., Title *Mandamus,* and cases there cited.

3. The writs specified in the Judiciary Act can only apply to cases in which the Court has jurisdiction over the party or the subject-matter of the suit, so that the Court can punish the party for disobedience or change the title to the subject-matter of the suit by judicial proceedings. This Court has no jurisdiction over Betsey McIntosh in the Indian country, nor over the United States as a corporation, nor the money in the Treasury, and therefore has no authority to act upon or control either. 3 Bland, ch. R., 423–4;[3] 7 Paige, 167;[4] 7 Vesey, 251;[5] 4 John., N. Y., ch. 25;[6] 3 Daniell's Ch. Prac., 133–4; Sugden on Vend., 156; Osborn *vs.* U. S. Bank (5 Cond. R., 764, 768); Story's Conflict of Laws, 450; Act of Feb. 27, 1801, sec. 5, Vol. 2, Stat. at Large, 106; Act of May 3, 1802, sec. 1, *idem* 193; see also act of Feb. 28, 1839, sec. 1, Vol. 5, Stat. at Large, p. 321, where provision is made concerning absent defendants.

4. There is no authority in law for a plaintiff to make the United States a party defendant in a suit, or to attach or control their moneys in the Treasury, either directly or indirectly. Naming an officer of the Treasury in the process, and serving it upon him, will not affect the United States nor their money in the Treasury. McKim *vs.* Odum (3 Bland's Ch. R., 420–423–424); Att'y Gen's Opinions, pp. 507–508–510, 1066, 1103, 1303, 1304, 1425.

5. The common law of Maryland, even if now in force in this District under the act for organizing the District of Columbia (2 Stat. at Large, p. 104), does not extend the jurisdiction of this Court over the executive officers of the Government as such; for the laws of Maryland in force at the time of the passage of that act did not authorize their

[3] McKim *vs.* Odom.   [4] Waller *vs.* Harris.   [5] Iveson *vs.* Harris.   [6] Fellows *vs.* Fellows.

Courts to issue writs of injunctions or *mandamus* against an executive officer of that State, or an officer of the General Government. No case of that kind has been cited, and none can be found.

By the Act of July 15th, 1790, the seat of the National Government was transferred to this District on the first Monday in December, 1800. By the 1st section of the Act the operation of " the laws of the State within said District shall not be affected by this acceptance until the time fixed for the removal thereof, and until Congress shall otherwise provide."

The laws of Maryland at the time of the Acts of July 16, 1790, and February 27, 1801, contained no provision or authority giving any Court in that State jurisdiction over the officers of the Executive Departments of the Federal Government. If the Courts of that State could not then have exercised such jurisdiction, then no Court can now do it, the powers of the Courts not having increased.

If the Supreme or other high Court of Maryland had the power claimed, it does not follow that such power is delegated to this Court, because it is not provided that this Court is clothed with the same power. We may as well say that the first section of District of Columbia Act transferred her highest Courts here, as to affirm that the jurisdiction was transferred to this Court when neither is provided.

6. Even if the Courts have jurisdiction over the officer in any case, such jurisdiction only extends to cases of a *ministerial*, and not to those of an executive character. The acts which the complainant wishes performed are of an executive character, and therefore this Court has no jurisdiction. Kendall *vs.* United States, 12 Peters, 524; McIntyre *vs.* Wood, 7 Cr., 504; McClung *vs.* Silliman, 6 Wh., 598; Decatur *vs.* Paulding, 14 Peters, 497; 1 Bland, 186–189, 584 in Note; Bordley *vs.* Lloyd, 1 H. & McH., 27; Elliott *vs.* The Levy Court, 1 *idem*, 559; Runkle *vs.* Winemiller, 4 H. & McH., 429; Howard *vs.* The Levy Court, H. & J., 538; Williams *vs.* Codman, G. & J., 184;

McKim, *vs.* Odum, 3 Bland, 407; Md. Digest of 1847, Title *Mandamus*, 706–7; Brashears *vs.* Mason, 6 How., 92, 100, 101, 102. Ministerial acts are those which are specifically directed by a superior power to be performed by an inferior, in relation to which such subordinate ministerial officer is required to exercise no discretion or judgment. He must literally obey the command and perform the act directed. Executive acts are those which involve discretion or judgment in determining whether the duty exists and whether the law and the usual and appropriate forms have been complied with, and these are the acts which are performed by public officers in executing the laws in the ordinary routine of the business of the Government. Decatur *vs.* Paulding, 14 Peters, 497; Kendall *vs* U. S., 12 Peters, 524.

By the Act of July 9, 1832, Stat. at Large, Vol. 4, p. 564, sec. 1, and that of June 30, 1834, *idem* 735, the President is authorized to make rules and regulations for carrying into effect all laws relating to the Indian affairs, including accounts. This power he executed through the War Department. Williams *vs.* Howard, 1 How., 290; Parker *vs.* U. S., 1 Peters, 296; U. S. *vs.* Eliason, 16 Peters, 291; Wilcox *vs.* Jackson, 13 Peters, 490; Holcomb's U. S. Digest, 220, 221, 222. The Act of August 7, 1789, 1 Stat. at Large, 49, ordains that the Secretary of War shall conduct the business of the Department in such manner as the President shall from time to time order and instruct. On the 11th of November, 1836, the Secretary of War adopted a regulation by which the Commissioner of Indian Affairs was directed to rigidly examine all claims and accounts, and when in the exercise of a sound discretion he should be of the opinion that the claim was just, that it should receive his sanction and to be passed to the Second Auditor for settlement; and when contrary to the regulations or instructions, or in his opinion improper or unjust, that he should withhold his sanction and state his objection for the consideration of the accounting officers; but, in all cases of difficulty depending

on discretion or authority, that he should take the direction of the Secretary of War. Report of Com. of Indian Affairs to Congress of Dec. 1, 1837.

All of the acts of the respective officers through whose hands a claim of this nature has to pass are clearly of an executive nature. None of them can be performed and none declined, without the exercise of the distinguishing characteristic of an executive act, judgment or discretion. Executive officers, appointed by the President, can be controlled in the exercise of their duties only by the President. McClung *vs.* Silliman, 6 Wh., 598; Holc. Dig., 571, § 43. The President is beyond the power of any other department except in cases of impeachment. Kendall's Case, 12 Peters, 524; Holc. Dig., 221. This necessarily results from the power conferred by Article II, sec. 3, of the Constitution, requiring him to take care that the laws be faithfully executed. And if the President can be controlled in the execution of his duties, directly by the judiciary, it is equally clear that he cannot be reached by proceeding against his subordinates. Were the opposite doctrine to prevail, there would no longer be, what was intended by the framers of the Constitution, an independent and distinct executive branch of the Government; for all acts required of the President in causing the laws to be faithfully executed, are, of necessity, performed through and by his subordinates. The power contended for would enable this Court to control the whole machinery of the Government. A pension agent could be compelled to pay on a power of attorney to the exclusion of the pensioner in person, even whether such power was made in conformity to the regulations under which the agent was acting or not. The Court could direct to whom the money should be paid under our treaty with Mexico. In time of war it might enjoin against supplying the pay, commissary or quartermaster's department, and direct the payment of a debt to the agent of our adversary, to the extent of the entire means in the Treasury. This Court might even enjoin the

salaries of the Justices of the Supreme Court of the United States, or declare that of the President vested in and payable to one of his creditors. It would require officers to perform acts for which it would be the duty of the President to displace them.

If it is said that there ought to be some control over the Executive in the discharge of the various duties committed to that branch of the Government, two answers may be given : (1.) The Constitution and laws have created no such tribunal. (2.) Judges appointed for life, and not elected by the people, but beyond their reach, are no better qualified for this duty than the Executive, who, once in four years, submits his acts to the consideration of his constituents.

CRANCH, C. J., all the judges concurring, gave the opinion of the Court:

The first question in natural order is that of jurisdiction. It is, therefore, the first which the Court will consider.

It is understood, as admitted in argument, that if the act intended to be enjoined be not a merely ministerial act, the Court has no jurisdiction to enjoin the officers of the Treasury from performing it.

This doctrine was first promulgated by the Supreme Court of the United States, in Marbury *vs.* Madison, 1 Cranch, 165, where Marshall, C. J., says: " If some acts be examinable and others not, there must be some rule of law to guide the Court in the exercise of its jurisdiction;" and in the next page he says: " Where the heads of departments are the political or confidential agents of the Executive merely to execute the will of the President, or *rather to act in cases in which the Executive possesses no constitutional or legal discretion,* nothing can be more perfectly clear than that their acts are only politically examinable." And again, in page 170, he says: " The province of the Court is solely to decide on the rights of individuals, not to enquire how the Executive or executive officers, perform duties in which they have discretion. Questions, in their nature political, or which are,

by the Constitution and laws, submitted to the Executive, can never be made in this Court."

The Chief Justice then prooceeds to show that the act required to be done (the delivery of the commission to Mr. Marbury) was purely a ministerial act in respect to which the Executive had no discretion.

In the case of Kendall *vs.* U. S., 12 Peters, 609, Mr. Justice Thompson in delivering the opinion of the Supreme Court of the United States, says:

"Under the first head of inquiry it has been considered by the counsel on the part of the Postmaster General (Mr. Kendall) that this is a proceeding against him to enforce the performance of an official duty, and the proceeding has been treated as an infringment upon the executive Department of the Government, which has led to a very exclusive range of argument upon the independence and duties of that department; but which, according to the view taken by the Court of this case, is entirely misapplied. We do not think that the proceedings in this case interfere, in any respect whatever, with the rights or duties of the Executive, or that it involves any conflict of powers between the executive and judicial department of the Goverment. The *mandamus* does not seek to direct or control the Postmaster General in the discharge of any official duty partaking, in any respect, of an executive character, but to enforce the performance of a mere *ministerial act,* which neither he nor the President had any authority to deny or control."

Again he says: "The executive power is vested in a President, and as far as his powers are derived from the Constitution he is beyond the reach of any other department, except in the mode prescribed by the Constitution through the impeaching power. But it by no means follows that every officer in every branch of that department is under the exclusive direction of the President. Such a principle, we apprehend, is not, and certainly cannot be claimed by the President."

"There are certain political duties imposed upon many

officers of the executive department, the discharge of which is under the direction of the President. But it would be an alarming doctrine that Congress cannot impose upon any executive officer any duty they may think proper which is not repugnant to any rights secured and protected by the Constitution; and in such cases the duty and the responsibility grow out of, and are subject to the control of, the law, and not to the direction of the President. And this is emphatically the case where the duty enjoined is of a mere *ministerial character.*"

"Let us proceed, then," he says, " to an examination of the act required, by the *mandamus,* to be performed by the Postmaster General; and his obligation to perform, or his right to resist the performance, must depend upon the Act of Congress of the 2d of July, 1836. This is a *special* act for the relief of the relators Stockton and Stokes, and was passed, as appears on its face, to adjust and settle certain claims which they had for *extra* service as contractors for carrying the mail. These claims were, of course, upon the United States through the Postmaster General. The real parties to the dispute were therefore the relators and the United States. The United States could not, of course, be sued, or the claims in any way enforced against the United States without their consent, obtained through act of Congress, by which they consented to submit these claims to the solicitor of the Treasury to inquire into the equity of the claims, and to make such allowances therefor as, upon a full examination of all the evidence, should seem right according to the principles of equity; and the act directs the Postmaster General to credit the relators with whatever sum, if any, the solicitor shall decide to be due to them for or on account of any such services or contract."

Again (p. 611) the Court says: " Under this law the Postmaster General is vested with no discretion or control over the decisions of the solicitor, nor in any appeal or review of that decision provided for by the act. The terms of the submission was a matter entirely within the discre-

tion of Congress; and if they thought proper to vest such a power in any one, and especially as the arbritrator was an officer of the Government, it did not rest with the Postmaster General to control Congress or the solicitor in that affair."

Again (p. 613) the Court says: " The act required by the law to be done by the Postmaster General is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act, *purely ministerial*, and about which the Postmaster General had no · discretion whatever. The law, upon its face, shows the existence of accounts between the relators and the Post Office Department. No money was required to be paid, and none could have been drawn out of the Treasury without further legislative provision, if this *credit* should overbalance the *debit* standing against the relators. But this was a matter with which the Postmaster General had no concern. He was not called upon to furnish the means of paying such balance, if any should be found. He was simply required to give the credit. This was not an official act in any other sense than being a transaction in the Department where the books and accounts were kept; and was an official act in the same sense that an entry in the minutes of a Court pursuant to an order of the Court, is an official act. There is no room ·for the exercise of any discretion, official or otherwise; all *that* is shut out by the direct and positive command of the law, and the act required to be done is, in any just sense, *a mere ministerial act*."

But the case now before this Court is very different from that of Stockton & Stokes. This is an application upon a bill in ·equity filed for an injunction to inhibit the Secretary of the Treasury and the Second Comptroller from paying to Betsey McIntosh the sum of $3,840 less by the sum·which has been paid to the defendant, John H. Eaton, so that including the sum so already paid to him, the one-half of the said certificate in favor of Betsey McIntosh may be held subject to the final decree of this Court. This application.

is founded upon the supposition that this Court may, by its final decree, order the Secretary of the Treasury to pay to the complainant McElrath half of the amount of the said certificate including what has been paid to the defendant, Eaton; for if this Court can not make such a final decree, the injunction, if granted, will be vain and nugatory.

This, then, is the question of jurisdiction, and depends upon the question whether the payment of this claim by the Secretary of the Treasury is an official executive act or is purely a ministerial act, as in the case of Stockton & Stokes.

The difference between ministerial acts and executive official acts is clearly stated by the Supreme Court in Decatur *vs.* Paulding, 14 Peters, 514, 515.

Mr. Chief Justice Taney, in delivering the opinion of the Court, said: " In the case of Kendall *vs.* United States, 12 Peters, 524, it was decided in this Court that the Circuit Court for Washington County in the District of Columbia has the power to issue a *mandamus* to an officer of the Federal Government commanding him to do a ministerial act. The first question, therefore, to be considered in this case is, whether the duty imposed upon the Secretary of the Navy, by the resolution in favor of Mrs. Decatur, was a ministerial act."

" The duty required by the resolution was to be performed by him as the head of one of the executive departments of the Government in the ordinary discharge of his official duties. In general such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties."

" The head of an executive department of the Government in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress under which he is from time to time required to act."

" The Court could not entertain an appeal from the decision of one of the Secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion

or judgment; nor can it by *mandamus* directly upon the officer guide and control his judgment or discretion in the matters committed to his care in the ordinary discharge of his official duties."

Again (p. 516) he said : " The interference of the Courts with the performance of the ordinary duties of the executive departments of the Government would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given to them."

" The doctrines which this Court now hold in relation to the executive departments of the Government are the same that was dictinctly announced in the case of Kendall *vs.* The United States, 12 Pet, 524."

Again (p. 616), he said : " We have referred to these passages in the opinion of the Court in the case of Kendall *vs.* The United States, in order to show clearly the distinction between a ministerial act required to be done by the head of an executive department, and a duty imposed upon him in his official character as the head of such department, in which judgment and discretion are to be exercised.   There was in that case a difference of opinion in the Court in relation to the power of the Court to issue the *mandamus.* But there was no difference of opinion respecting the act to be done.   The Court was unanimously of opinion that in its character the act was merely ministerial.   In the case before us it is clearly otherwise, and the resolution in favor of Mrs. Decatur imposed a duty on the Secretary of the Navy which required the exercise of judgment and discretion; and in such a case the Circuit Court had no right, by *mandamus*, to control his judgments and guide him in the exercise of a discretion which the law had confided to him."

The same doctrines are affirmed by the Supreme Court, in the case of Brashear *vs.* Mason, 6 How., 100, where Mr. Justice Nelson, in delivering the opinion of the Court, says: 'We are of the opinion that if the plaintiff has made out a title to his pay as an officer of the U. S. Navy, a *mandamus* would not lie, in the Court below, to enforce

the payment. The Constitution provides that no money shall be drawn from the Treasury but in consequence of appropriations made by law.' " (Art. 1, sec. 9.)

And it is declared by Act of Congress, May 7th, 1822, 3 Stat. at Large, 689, sec. 3, " that all moneys appropriated for the use of the War and Navy Departments shall be drawn from the Treasury by warrants of the Secretary of the Treasury, upon requisitions of the Secretaries of these Departments, countersigned by the Second Comptroller."

And in p. 101, Mr. Justice Nelson says : " In the case of Decatur *vs.* Paulding, 14 Peters, 497, it was held by this Court that a *mandamus* would not lie from the Circuit Court of the District of Columbia to the Secretary of the Navy to compel him to pay to the plaintiff a sum of money claimed to be due her as a pension under a resolution of Congress."
" The Court distinguish the case from Kendall *vs.* United States, 12 Peters, 524, where there was a *mandamus* to enforce the performance of a mere ministerial act not involving, on the part of the officer, the exercise of any judgment or discretion." ·

In the case before this Court, the Secretary of the Treasury, in executing the resolution of Congress of the 14th March, 1848, was called on by the complainant to pay to him, as assignee of Betsey McIntosh, one-half the sum appropriated by that resolution, less the sum already paid the defendant, J. H. Eaton.

The validity and construction of the power of attorney and assignment set up by McElrath, and the applicability and construction of the Act of Congress, July 29th, 1846, ch. 66, are necessarily involved in the duty required of the Secretary of the Treasury to execute the resolution of March 14th, 1848.

It may be observed, also, that the resolution of the 14th of March, 1848, requires the Secretary of the Navy to pay the money to Betsey McIntosh (herself), not to her executors, administrators or assigns. That the supposed assignment to McElrath, if it be an assignment, purports to be of

only a part of the debt due by the United States, and that the power of attorney to McElrath does not expressly authorize him to receive the money or any part of it, but purports to be only a power to prosecute the claim to allowance or judgment; so that, upon these points, also, it would be necessary that the Secretary, before ordering the payment of the money, should decide whether he could lawfully pay the money to any other person than Betsey McIntosh herself—whether it would not be contrary to the policy of the law, especially in the case of an Indian claim, to pay a part only of the claim, and he must also decide whether the power of attorney was duly executed.

These are all acts of executive discretion, in which the Secretary has sought the advice and opinion of the Attorney General of the United States, and can, in no just sense, be said to be mere ministerial acts.

In the exercise of this discretion, this Court has no right to guide or control the executive officer, or to entertain any appeal from his decision.

Upon these authorities, and by these reasons, this Court is satisfied that the payment of the claim of Betsey McIntosh is not a mere ministerial act, but is a duty appertaining to the office of the Secretary of the Treasury in the discharge of which he has a discretion which this Court has not jurisdiction to control; and being of that opinion the Court deems it unnecessary, as it would be unwilling, to give any opinion upon the other questions which have been raised in argument.

The Court, therefore, refuses to grant the injunction prayed for against the Secretary and Second Comptroller of the Treasury.