## No. 991. *Dunlap* v. *Black.*

This was an application by Oscar Dunlap, the relator, to the Supreme Court of the District of Columbia, for a writ of mandamus to be directed to the respondent, Black, as Commissioner of Pensions, commanding him to re-issue to the relator his pension certificate for $25 per month from June 6, 1866; $31.25 per month from June 4, 1872; $50 per month from June 4, 1874; and $72 per month from June 17, 1878, first deducting all sums paid relator under previous pensions.

By the act of March 3, 1873, 17 Stat. 569, c. 234, § 4, Rev. Stat. 4698, it was provided that a pension of $31.25 per month should be allowed to all persons who, while in the military or naval service, had lost their sight, or both hands or both feet,

or had been permanently and totally disabled, so as to require the regular aid and attendance of another person; and a pension of $24 per month to those who had lost one hand and one foot; and $18 per month to those who had lost either one hand or one foot; and other less pensions for lesser injuries; any increase of pension to commence from the date of the examining surgeon's certificate. By the act of June 18, 1874, 18 Stat. 78, c. 298, Sup. Rev. Stat. p. 39, it was provided that, in cases of blindness or loss of both hands or both feet, or total helplessness, requiring the regular and personal aid of another person, the pension should be increased from $31.25 to $50 per month. By the act of February 28, 1877, 19 Stat. 264, c. 73, Sup. Rev. Stat. 282, it was provided that those who had lost one hand and one foot should be entitled to a pension for each of such disabilities at the rate of existing laws, — which made the total pension $36 per month. The relator, in April, 1877, applied for the benefit of this law, and it was granted to him. By the act of June 16, 1880, 21 Stat. 281, c. 236, Sup. Rev. Stat. 560, it was enacted that all those then (at the date of the act) receiving a pension of $50 per month under the act of June 18, 1874, should receive $72 per month from June 17, 1878.

After the last act was passed, the relator applied for the increase allowed by it. The Commissioner of Pensions, being of opinion that he did not come within its terms, rejected the application, but granted him a certificate for a pension of $50 per month under the act of 1874, to be received from May 25, 1881, the date of his medical examination. The petition for mandamus sets out the decision of the Commissioner in full, in which it is conceded that the relator has become permanently disabled. The following is an extract from the decision, to wit:

"WASHINGTON, D. C., *October* 15, 1887.

"In this case the application of the claimant for rerating and for increase will be allowed at $50 per month from May 25, 1881, the date of the first medical examination under the claimant's application of June 26, 1880. This rating is allowed under the act of June 18, 1874, it sufficiently appearing by the

evidence in this case that the claimant has lost both a hand and a foot, and at the same time has been so additionally injured in the head as, from a period prior to the rerating or increase in this case, to render him totally and permanently helpless, requiring from thence until now the regular personal aid and attendance of another person. The reason why the claimant's rating is not advanced to $72 per month is that he was not, on the 16th of June, 1880, [the date of the act,] receiving pension at the rate of $50 per month, nor was he entitled to receive a pension of $50 per month at that date, for the reason that, while the degree of helplessness which has been shown was that contemplated by the law, the claimant himself (neither on his own motion nor under the guidance of those who are legally responsible for his actions in this claim) had not made application to be rated in pursuance of the act of June 18, 1874, but on the contrary thereof, had asked to be rated and had been rated at $36 per month, under the act of February 28, 1877."

The decision proceeds to discuss further the reasons for the conclusion to which the Commissioner had come.

The relator, by his counsel, strenuously contends that the concession made by the Commissioner with regard to the disability of the relator shows that it was his clear duty to have granted a certificate for the larger pension of $72 per month. The following passage in the petition for mandamus shows the position taken by the relator:

"And your relator further says, that the respondent has thus expressly found the facts in your relator's case to be: (1) that while your relator was in the military service . . . he sustained such wounds and injuries as resulted in the loss of his right hand and right foot, and at the same time sustaining injury to the head; (2) that your relator was thereby rendered 'totally and permanently helpless, requiring from thence till now the regular aid and attendance of another person'; and (3) that your relator applied to the Commissioner of Pensions on June 26, 1880, for pension on account thereof. And your relator says that upon this finding of the facts whether he is entitled to a rerating and an increase of pension from date of

discharge, so as to give unto him a pension commensurate with his disabilities so found to exist by the respondent, is a question of law, and that it does not lie in the discretionary power of the respondent, as Commissioner of Pensions, to deny or in anywise abridge his rights with respect thereto."

This extract shows the theory of the petitioner and the doctrine which he invokes in support of his application. We have been more full in stating the facts of the case in order that the legal grounds on which that application is based may clearly appear. The case does not require an extended discussion. The questions of law on which it depends have been closed by repeated decisions of this court.

The amenability of an executive officer to the writ of mandamus to compel him to perform a duty required of him by law was discussed by Chief Justice Marshall in his great opinion in the case of *Marbury* v. *Madison*, 1 Cranch, 137; and the radical distinction was there pointed out between acts performed by such officers in the exercise of their executive functions, which the Chief Justice calls political acts, and those of a mere ministerial character; and the rule was distinctly laid down that the writ will not be issued in the former class of cases, but will be issued in the latter. In that case, President Adams had nominated, and the Senate had confirmed, Marbury as a justice of the peace of the District of Columbia; and a commission in due form was signed by the President appointing him such justice, and the seal of the United States was duly affixed thereto by the Secretary of State; but the commission had not been handed to Marbury when the offices of the government were transferred to the administration of President Jefferson. Mr. Madison, the new Secretary of State, refused to deliver the commission, and a mandamus was applied for to this court to compel him to do so. The court held that the appointment had been made and completed, and that Marbury was entitled to his commission, and that the delivery of it to him was a mere ministerial act, which involved no further official discretion on the part of the Secretary, and could be enforced by mandamus. But the court did not issue the writ, because it would have been an exercise of original

jurisdiction which it did not possess.    Whilst this opinion will always be read by the student with interest and profit, it has not been considered as invested with absolute judicial authority except on the question of the original jurisdiction of this court. The decision on this point has made it necessary for parties desiring to compel an officer of the government to perform an act in which they are interested to resort to the highest court of the District of Columbia for redress.    It has been held in numerous cases, and was held after special discussion in the cases of *Kendall* v. *The United States,* 12 Pet. 524; and *United States* v. *Schurz,* 102 U. S. 378, that the former Circuit Court of the District, and the present Supreme Court of the District, respectively, were invested with plenary jurisdiction on the subject.    On this point there is no further question.

'The two leading cases which authoritatively show when the Supreme Court of the District may, and when it may not, grant a mandamus against an executive officer, are the above cited cases of *Kendall* v. *United States on the Relation of Stokes,* 12 Pet. 524, and *Decatur* v. *Paulding,* 14 Pet. 497.    The subsequent cases have followed the principles laid down in these, and do little more than illustrate and apply them.    In the former case the mandamus was granted, and the decision was affirmed by this court.    The case was shortly this: Stockton & Stokes, as contractors for carrying the mails, had certain claims against the government for extra services, which they insisted should be credited in their accounts, and a controversy arose between them and the Post Office Department on the subject.    Congress passed an act for their relief, by which the Solicitor of the Treasury was authorized and directed to settle and adjust their claims, and make them such allowances as upon a full examination of all the evidence might seem to be equitable and right; and the Postmaster General was directed to credit them with whatever sums the Solicitor should decide to be due them.    The Solicitor, after due investigation, made his report, and stated the sums due to Stockton & Stokes on the claims made by them; but the Postmaster General, Mr. Kendall, refused to give them credit as directed by the law. This the court held he could be compelled to do by manda-

mus, because it was simply a ministerial duty to be performed, and not an official act requiring any exercise of judgment or discretion. This court, through Mr. Justice Thompson, said: "The act required by the law to be done by the Postmaster General is simply to credit the relators with the full amount of the award of the Solicitor. This is a precise, definite act, purely ministerial; and about which the Postmaster General had no discretion whatever. The law upon its face shows the existence of accounts between the relators and the Post Office Department. No money was required to be paid; and none could be drawn from the Treasury without further legislative provision, if this credit should overbalance the debit standing against the relators. But this was a matter with which the Postmaster General had no concern. He was not called upon to furnish the means of paying such balance, if any should be found. He was simply required to give the credit. This was not an official act in any other sense than being a transaction in the department where the books and accounts were kept; and was an official act in the same sense that an entry in the minutes of a court, pursuant to an order of the court, is an official act. There is no room for the exercise of any discretion, official or otherwise; all that is shut out by the direct and positive command of the law, and the act required to be done is, in every just sense, a mere ministerial act."

In the other case, *Decatur* v. *Paulding*, the mandamus was refused by the Circuit Court, and that decision was also affirmed by this court. The case was this: On the 3d of March, 1837, Congress passed an act giving to the widow of any officer who had died in the naval service a pension equal to half of his monthly pay from the time of his death until her death or marriage. On the same day Congress passed a resolution granting a pension to Mrs. Decatur, widow of Stephen Decatur, for five years, commencing June 30, 1834, and the arrearages of the half pay of a post captain from Commodore Decatur's death to the 30th of June, 1834. Mrs. Decatur applied for and received her pension under the general law, with a reservation of her rights under the resolution, claiming the pension granted by that also. The Secretary of

the Navy, acting under the opinion of the Attorney General, decided that she could not have both. Thereupon she applied for a mandamus to compel the Secretary to comply with the resolution in her favor. Chief Justice Taney delivered the opinion of the court, and laid down the law in terms that have never been departed from. We can only quote a single passage from this opinion. The Chief Justice says: "The duty required by the resolution was to be performed by him [the Secretary of the Navy] as the head of one of the executive departments of the government, in the ordinary discharge of his official duties. In general, such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress, under which he is from time to time required to act. If he doubts, he has a right to call on the Attorney General to assist him with his counsel; and it would be difficult to imagine why a legal adviser was provided by law for the heads of the departments, as well as for the President, unless their duties were regarded as executive, in which judgment and discretion were to be exercised.

"If a suit should come before this court, which involved the construction of any of these laws, the court certainly would not be bound to adopt the construction given by the head of a department. And if they supposed his decision to be wrong, they would, of course, so pronounce their judgment. But their judgment upon the construction of a law must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the act of Congress, in order to ascertain the rights of the parties in the cause before them. The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or judgment. Nor can it by mandamus act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official

duties. The case before us illustrates these principles and shows the difference between executive and ministerial acts." The Chief Justice then goes on to show that the decision of the Secretary of the Navy in that case was entirely executive and official in its character, and that, in this respect, the case differed entirely from that of *Kendall* v. *Stokes.*

The principle of law deducible from these two cases is not difficult to enounce. The court will not interfere by mandamus with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the court having no appellate power for that purpose; but when they refuse to act in a case at all,.or when, by special statute, or otherwise, a mere ministerial duty is imposed upon them, that is, a service which they are bound to perform without further question, then, if they refuse, a mandamus may be issued to compel them.

Judged by this rule the present case presents no difficulty. The Commissioner of Pensions did not refuse to act or decide. He did act and decide. He adopted an interpretation of the law adverse to the relator, and his decision was confirmed by the Secretary of the Interior, as evidenced by his signature of the certificate. Whether if the law were properly before us for consideration, we should be of the same opinion, or of a different opinion, is of no consequence in the decision of this case. We have no appellate power over the Commissioner, and no right to review his decision. That decision and his action taken thereon were made and done in the exercise of his official functions. They were by no means merely ministerial acts.

The decisions of this court, which have been rendered since the cases referred to, corroborate and confirm all that has been said. The following are the most important, to wit: *Brashear* v. *Mason*, 6 How. 92; *United States ex rel. Goodrich* v. *Guthrie*, 17 How. 284; *Commissioner of Patents* v. *Whiteley*, 4 Wall. 522; *Georgia* v. *Stanton*, 6 Wall. 50; *Gaines* v. *Thompson*, 7 Wall. 347; *United States ex rel. McBride* v. *Schurz*, 102 U. S. 378; *Butterworth* v. *Hoe*, 112 U. S. 50.

In the two last cases cited, the mandamus was granted; and they were cases in which it was held that a mere ministerial duty was to be performed by the officer. In *United States ex rel. McBride* v. *Schurz*, the question related to a patent for land claimed by a preëmptor. All the proceedings had been gone through, the right of the applicant had been affirmed, the patent had been made out in the Land Office, signed by the President, sealed with the Land Office seal, countersigned by the recorder of the Land Office, recorded in the proper book, and transmitted to the local land officers for delivery; but delivery was refused because instructions had been received from the Commissioner to return the patent. The plea was, that it had been discovered that the lands belonged to a town site. The court held that this was an insufficient plea; that the title had passed to the applicant, and he was entitled to his patent, subject to any equity which other parties might have to the land, or to a proceeding for setting the patent aside; and that the duty of the Commissioner, or Secretary of the Interior, had become a mere ministerial duty to deliver the instrument — as was held in *Marbury* v. *Madison*, in relation to the commission of Marbury as justice of the peace. Of course, this case is entirely different from the case now under consideration.

The case of *Butterworth* v. *Hoe* was very similar in principle to that of *United States* v. *Schurz*. The Commissioner of Patents had decided in favor of the right of one Gill, an applicant for a patent in a case of interference, and adjudged that a patent should issue to his assigns accordingly. An appeal was taken to the Secretary of the Interior, who reversed the decision of the Commissioner. The latter thereupon, and for that reason, refused to issue a patent. It was a question whether an appeal lay to the Secretary of the Interior, and this court held that it did not, and that he had no jurisdiction in the matter. The court, therefore, held that the patent ought to be issued in accordance with the decision of the Commissioner, and that the mere issue of the patent was a ministerial matter for which a mandamus would lie. This case, like that of *United States* v. *Schurz*, is unlike the present.

All deliberation had ceased; the right of Gill, the applicant, was adjudged; there was nothing to be done but to deliver to the party the documentary evidence of his title. That was a mere ministerial matter.

We think that the mandamus was properly refused, and the judgment of the Supreme Court of the District is

*Affirmed.*