## SEYMOUR

*v.*

## THE UNITED STATES, EX REL. THE STATE OF SOUTH CAROLINA.

MANDAMUS; TRADE-MARKS.

1. Mandamus will not lie to compel the Commissioner of Patents to register a trade-mark after an application for its registration has been examined and rejected by him, his duties under the trade-mark act not being ministerial but requiring the exercise of judgment and discretion.

2. Whether a single consignment of goods to and the sale of them in a foreign nation will constitute commerce with a foreign nation, within the meaning of Section 2, the trade-mark act of March 3, 1881, requiring an applicant for a trade-mark to show that his trade-mark is used in commerce with foreign nations, *quaere.*

3. Where under the supposed authority of the Dispensary act of South Carolina of December 24, 1892, providing for the purchase and sale by the State of intoxicating liquors, a case of liquor, labelled with a certain device, was consigned to and sold in Canada by a commissioner of the State, and an application was thereupon made by the State, through its Governor, to the Commissioner of Patents to register such device as a trademark, it was *held* that the act did not give the State authority to trade in liquors outside its borders and the sale of the liquor in Canada was the act of the commissioner and not of the State, and therefore the trade-mark had not been used by the applicant in foreign commerce as required by the trade-mark act.

No. 272.    Submitted January 5, 1894.—Decided February 5, 1894.

THIS was a hearing upon an appeal by the Commissioner of Patents from an order of the Supreme Court of the District of Columbia, holding a law term, quashing a return of the Commissioner to an alternative writ of mandamus, issued upon the petition of the United States, *ex relatione* the State of South Carolina, to compel the Commissioner to register a trade-mark of the relator, and directing a peremptory writ to issue. *Reversed.*

The FACTS are sufficiently stated in the opinion.

*Mr. John I. Hall* and *Mr. Levin H. Campbell* for the Commissioner of Patents, appellant:

The Supreme Court erred in revising and reversing the decision of the Commissioner of Patents in that his decision was rendered in the performance of a discretionary duty, without fraud or abuse of his authority, and is, therefore, not subject to revision and reversal by the court on a petition for a writ of mandamus. *Marbury* v. *Madison.* 1 Cranch, 158; *Kendall* v. *U. S.*, 12 Wheat., 524; *Decatur* v. *Paulding*, 14 Pet., 497; *Commissioner of Patents* v. *Whitely*, 4 Wall., 535; *Butterworth* v. *Hoe*, 112 U. S., 50; *Dunlap* v. *Black*, 128 U. S., 40; *Redfield* v. *Windom*, 137 U. S., 637. It may be safely asserted that, according to the whole current of authorities, where a special tribunal is created by statute, without giving the courts, in express terms, any power to supervise and control the action of the officer, all the courts can lawfully do by mandamus is to compel the official to take up a case and act upon it; they cannot instruct him how to act, nor revise and reverse his decision after he has acted, except, perhaps, where he had acted fraudulently or in flagrant abuse of his office. The Commissioner of Patents is not directed by the trade-mark law to issue a certificate of registration of a trade-mark or an alleged trade-mark to every and any applicant therefor. The trade-mark law defines who shall be entitled to register a trade-mark; it has placed the Commissioner of Patents in charge of the administration of the law; it has authorized him to prescribe regulations with which applicants must comply; it has enacted that " no alleged trade-mark shall be registered unless the same appear to be lawfully used as such by the applicant in foreign commerce or commerce with Indian tribes "; " nor which is merely the name of the applicant," etc.; and that " in an application for registration the Commissioner of Patents shall decide the presumptive lawfulness of claim to the trade-mark." The allegation by an applicant that " the alleged trade-mark is lawfully used as such " is plainly not conclusive upon the Commissioner.

*Mr. John Altheus Johnson* and *Mr. James Edgar Smith* for the State of South Carolina, appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This case comes before us on appeal by the Commissioner of Patents from a judgment of the Supreme Court of the District of Columbia, in special term, ordering a peremptory writ of mandamus to issue, commanding him to register a trade-mark on the application of the State of South Carolina.

On July 15, 1893, Benjamin R. Tillman, Governor of the State of South Carolina, on behalf of said State, filed an application in the office of the Commissioner of Patents for the registration of a trade-mark, used in the sale of intoxicating liquors, consisting of the word " Palmetto." A *fac simile* of the label upon which this word is used was filed with the application. It has ornamented borders within which appears the word " Palmetto," printed above the coat of arms of the State of South Carolina; underneath this is a " name band " upon which may be printed the words, " Bourbon Whiskey," " New England Rum," or other designations, according to the kind of intoxicating liquor contained in the package upon which the label may be applied.

The application is in the ordinary form recommended for use by private corporations, by the rules and regulations of the Patent Office, and is verified by an affidavit in the following words: " Benjamin R. Tillman, being duly sworn, deposes and says, that he is the Governor of the State of South Carolina, the applicant named in the foregoing statement; that he verily believes that the foregoing statement is true; that the said State at this time has a right to the use of the trade-mark therein described; that no other person or firm or corporation has the right to such use, either in the identical form, or in any such near resemblance thereto, as might be calculated to deceive; that the said trade-mark is used by the said State in commerce with foreign nations, or Indian tribes, and particularly with Canada; and that the descrip-

tion and *fac similes* presented for record truly represent the trade-mark sought to be registered."

According to the rules of the office the application was submitted to the special examiner for investigation and report, who, without going into the merits, reported adversely on the ground that a State of the Union is not within the terms of the law permitting the registration of trade-marks, because it does not come within the designation of " person " or " corporation " as used therein.

The application then came before the Commissioner in person, and was presented with elaborate argument on behalf of the applicant. The Commissioner refused it on August 30, 1893, with a written statement setting out his reasons therefor, which concludes as follows: " It is considered that the State of South Carolina, notwithstanding the acts of the Governor and the State Board of Control, has no authorized trade in liquors outside its own limits, is not the owner of any trade-mark, has not at this time the use of the trade-mark sought to be registered, and therefore the application is denied."

Importance was sought to be attached to the report of the examiner by counsel for the relator on the argument, but we can see no good reason therefor. It is but the report of a partial examination made by a subordinate, and forms no part of the Commissioner's decision. In fact, he has expressly overruled the point made by the examiner and based his decision upon other and entirely distinct grounds which were not even alluded to in the examiner's report.

The Commissioner's decision shows that evidence was received by him in the course of his inquiry into the lawfulness of the State's claim to the use of the trade-mark. It is apparent that the Dispensary Act of South Carolina, under which the right to carry on trade in liquors is claimed by the State, was submitted for the consideration of the Commissioner, together with proof that the State Board of Control created by said act had adopted the trade-mark on July 1, 1893.

It appears also that proof was made with respect to the foreign commerce of the State in liquors, from the following paragraph of the decision:

" As the present legislation of Congress on trade-marks is restricted to those used in commerce with foreign nations, or the Indian tribes, the authorities have sold a case of the State's liquors, bearing this trade-mark, in Canada, and it is claimed that thus the trade-mark has been used in commerce with foreign nations."

After a motion for rehearing had been overruled by the Commissioner, this petition for mandamus was filed in the Supreme Court of the District. All the proceedings in the office of the Commissioner were made exhibits to the petition, including the elaborate printed arguments of the counsel for the applicant that had been submitted for his consideration.

Upon the service of the alternate writ, the Commissioner appeared and submitted a demurrer to the petition, which was overruled. He then made return by way of answer, setting out the grounds of his refusal to register substantially as contained in his decision, and questioning, as he had done by his demurrer, the right of the court to revise or control his action in the premises. This answer was held insufficient on motion of the relator, and a peremptory mandamus ordered to issue to compel the Commissioner to register the trade-mark as applied for.

Several errors have been assigned, but the points upon which the case turns, and to which the argument has been directed, are raised in the third and sixth of the series. The third is to the point, that the duties of the Commissioner, as prescribed by law, are not ministerial simply, but are such as to call for the exercise of judgment and discretion, and that his decision having been made in the performance of this discretionary duty, is not subject to revision by the courts. The sixth is to the effect that the State of South Carolina is not entitled to have this trade-mark registered because she is not, and cannot be, lawfully engaged in foreign commerce.

There ought to be little difficulty in the determination of the true office of the mandamus as applied to the Federal courts.  The decisions of the Supreme Court of the United States are numerous, and state with perfect agreement the principles which should govern the proceedings of the courts in application therefor.

Mr. Justice Miller, speaking for the court in *Gaines* v. *Thompson*, 7 Wall., 348, said:

" The extent of the jurisdiction which may lawfully be asserted by the Federal courts over the officers of the executive departments of the Government, has been mooted in this court from the case of *Marbury* v. *Madison*, 1 Cranch, 137, down to the present time; and while the principles which should govern the action of the courts in that regard have been settled long since, the frequent application of late to this court and to other Federal courts, for the exercise of powers not belonging to them, shows that the question is one not generally understood."

And we might add, the number of cases reported since that time shows that this misunderstanding has not ceased to exist.

It is settled beyond question, that mandamus will not lie save in a plain case, and where there is no other legal remedy. And this, it may be, has caused some of the prevailing misunderstanding of another and still more important principle, that is equally well settled, viz., that under no circumstances can the writ of mandamus be made to operate as a writ of error.

To the judiciary department is entrusted generally the interpretation of the laws, the determination of rights, and the application of remedies, and with the strong sense of their duties and obligations in this regard it is sometimes difficult for the courts to properly appreciate the fact that the executive department is charged with perfectly independent duties, not alone by the supreme law, but also by legislation thereunder, which require the ascertainment of facts, involve the interpretation of laws, and in many respects call for the

exercise of judgment and discretion by officers who are not required to be lawyers. And this independence is so complete, that no matter how gross an error may be committed, or however ill-advised the action of an executive officer may be, in the execution of these duties, the courts are nevertheless powerless to interfere where no appeal to them is given. Public and private interests may suffer in instances, and rights may sometimes be denied; but these alone do not authorize the interference of the courts with the duties of executive officers.

Greater evils could not exist under our system of government than would follow the usurpation by the judiciary, of powers not intrusted to them.

Where the duty prescribed is plain and specific, admitting of no discretion, calling for the exercise of no judgment, and the officer charged therewith refuses to perform it, to the injury or deprivation of the right of another, mandamus will lie to compel him to its performance. It will lie where the duties are discretionary, or even strictly judicial; never, however, to revise action that has been taken, but to compel reception and consideration, or the taking of jurisdiction, provided that, when action shall have been taken, the party aggrieved thereby would then have the right to appeal from the decision.

The two leading cases in the Supreme Court in which the question of mandamus to executive officers has been considered, are *Kendall* v. *Stokes*, 12 Pet., 524, and *Decatur* v. *Paulding*, 14 Pet., 497. In the first of these, the mandamus was ordered, while in the second it was refused.

" The subsequent cases," said Bradley, J., in *U. S., ex rel.* *Dunlap* v. *Black*, 128 U. S., 45, " have followed the principles laid down in these and do little more than illustrate and apply them . . . The principle of law deducible from these two cases is not difficult to enounce. The court will not interfere with the executive officers of the government in the exercise of their ordinary official duties, even where those duties require an interpretation of the law, the court having

no appellate power for that purpose; and when they refuse to act in a case at all, or when, by special statute or otherwise, a mere ministerial duty is imposed upon them, that is, a service which they are bound to perform, without further question, then, if they refuse, a mandamus may be issued to compel them." It is by the " nature of the thing to be done that the propriety or impropriety of issuing a mandamus is to be determined."

The distinction between official acts and duties that are ministerial, and those which are judicial or quasi-judicial, which has been established by the great weight of authority, may be stated as follows: Where the law commands the doing of a specific thing and charges the officer with its execution, in terms so plain and certain as to leave him no reasonable alternative but obedience, the act may be said to be ministerial simply. Where, on the other hand, the act involves the exercise of discretion in determining whether the right exists or a duty is required to be performed in the particular case, it ceases to be ministerial and becomes quasi-judicial.

It is necessary now to examine the statute under which the right is claimed in this case, and to determine whether the duties prescribed therein for performance by the Commissioner are ministerial simply, or discretionary.

In the first place, it may be said of the trade-mark act that no appeal lies to this court from the decision of the Commissioner refusing registration, as it does in the case of refusal of a patent. And we have recently held, in *Einstein* v. *Sawhill, ante*, p. 10, that the right of appeal does not exist from decisions made in cases of dispute between applicants for registration. In that case, Mr. Justice Morris, who spoke for the court, had occasion to review the legislation of Congress on the subject of trade-marks, and explain the cause of the substitution of the elaborate legislation of previous years by the restricted act of March 3, 1881, which limits the registration of trade-marks to such only as may have been actually used in commerce with foreign nations or the Indian tribes.

Section 1 of this act provides that " owners of trade-marks used in commerce with foreign nations or with the Indian tribes," may obtain registration thereof by causing to be recorded in the Patent Office a statement specifying the name, location, citizenship, etc., of the party applying, the class of merchandise and description of goods in such class to which the mark is appropriated, a description of the trade-mark with *fac similes* thereof, and the mode in which it is applied to goods, and the length of time during which it has been used. In addition, the applicant must pay a fee of twenty-five dollars and " comply with such regulations as may be prescribed by the Commissioner of Patents."

Section 2 requires that the application be accompanied by a declaration under oath, to the effect that the applicant has, at the time, the right to the use of the trade-mark; that no other person or firm, etc., has the right to such use either in identical form, or in such near resemblance as might be calculated to deceive; that it is used in commerce with foreign nations or Indian tribes, and that the description and *fac similes* presented truly represent it.

Section 3 reads as follows: " That the time of the receipt of any such application shall be noted and recorded. But no alleged trade-mark shall be registered unless the same appear to be lawfully used as such by the applicant in foreign commerce or commerce with the Indian tribes, as above mentioned, or is within the provision of a treaty, convention, or declaration with a foreign power; nor which is merely the name of the applicant; nor which is identical with a registered, or known trade-mark of another, and appropriate to the same class of merchandise, or which so nearly resembles some other person's lawful trade-mark as to be likely to cause confusion or mistake in the mind of the public, or to deceive purchasers. In an application for registration, the Commissioner of Patents shall decide the presumptive lawfulness of claim to the alleged trade-mark; and in any dispute between an applicant and a previous registrant, or between applicants, he shall follow, so far as the same may be

applicable, the practice of courts of equity of the United States in analogous cases."

The remaining sections of the statute are not of sufficient importance in the consideration of the question to be set out here, but may be referred to hereafter.

We think it plain that the duties of the Commissioner are something more than ministerial, and that they differ widely from the duties of a mere register of deeds, or receiver of papers for file, with which an attempt has been made to institute a comparison.

A trade-mark that may have been in undisputed use for years in domestic trade, and invested with all the characteristics of a trade-mark good at common law, is nevertheless not a trade-mark in the sense of this statute unless it shall have been lawfully used in commerce with foreign nations or the Indian tribes. The Commissioner is required to decide "the presumptive lawfulness of claim to the alleged trade-mark." This, in connection with the preceding portion of the third section aforesaid, can mean nothing less than that in all cases he shall inquire, first, if the applicant has actually used the trade-mark in lawful commerce with foreign nations or with the Indian tribes, and then, if he has the right to the use of it at all.

If he finds that the "alleged trade-mark" is the name of the applicant, or any other name which cannot be lawfully converted into a trade-mark at common law, or that it is identical with the trade-mark of another, registered or unregistered, or is a deceptive imitation of another, or that it is not the property of the applicant, he cannot admit it to registration though he may be satisfied that the applicant has used it in regular commerce with foreign nations or the Indian tribes. So likewise, he may be satisfied with the lawfulness of the applicant's ownership and right to the use, but unless it be made to appear also that he has lawfully used it in actual commerce with foreign nations or the Indian tribes the registration must be denied.

No provision is made as to how the Commissioner shall

inform himself with respect to the existence of these conditions; but the fact that he is authorized to make regulations and that applicants are required to comply with them, would seem necessarily to imply that he is left free to institute the necessary inquiry in his own way. This he appears to have done in this case, for his decision refers to matters of fact considered by him, which do not appear in the application and verification thereof. Certain rules and regulations have been made by the Commissioner, as shown in the record, and by one of these he has added to the requirements of Section 2 in this, that the verification of the application must show not only in general that the trade-mark is lawfully used in commerce with foreign nations or the Indian tribes, but also one or more of these, by name, with which the commerce is carried on. This regulation has been in force for a long time, and was followed in this case without question; for in the verification of relator's application it is said: "The said trade-mark is used in commerce with foreign nations, or Indian tribes, and particularly with Canada."

Why require this specification of the name of one or more of the foreign nations or Indian tribes with which commerce is had, unless it is to aid the Commissioner in the investigation of the truth of the statement should he deem the same necessary or proper? The particular and only value of this required specification consists in the facility which it may afford the Commissioner in ascertaining if the trade-mark is lawfully so used.

It is contended that, inasmuch as the last clause of Section 3 provides for the manner of trial as in courts of equity, so far as applicable, in the event of dispute with a previous registrant, or a rival applicant, it necessarily covers and provides for the only contingency in which the Commissioner is authorized to exercise any discretion whatever. This clause only provides the practice that shall prevail in the event that an actual contest shall be made by rival registrants or applicants, and is in no wise inconsistent with the idea that where there is no contest, the Commissioner may make

the necessary inquiry into the existence of all the facts necessary to registration, in any manner that he may deem adequate to that end. " The presumptive lawfulness of claim " which he is called on to decide is in express accord with the provision of Section 7, which makes the registration " *prima facie* evidence of ownership."

This limitation of the effect of the Commissioner's decision is claimed also as supporting the relator's contention. But we can see nothing either in its letter or spirit which goes to show that the Commissioner's action in the premises is to be without the exercise of discretion. His determination, either with or without contest, is not made conclusive for the better reason, and one more in accord with the spirit of our institutions, that it would be unwise and probably unjust, to leave the final determination of what may be a valuable right of property, without respect to the registration, to an executive officer from whose decision there is no appeal.

The contention of the relator, in its last analysis, is that when a verified application is presented to the Commissioner, and there is no contest depending between the applicant and other parties, there is nothing left to his discretion, and it becomes his imperative duty to issue the certificate of registration.

The reasonable interpretation of the law, in our opinion, is that if there be a contest the Commissioner shall try the same in accordance with the practice of courts of equity, so far as applicable. But if there be no contest between opposing parties, he may accept the sworn declaration as sufficient if he have no cause to suspect its untruth; or he may, in the exercise of his discretion, inquire into the truth of its allegations. And in the event that he should have reasonable ground to suspect that an imposition has been attempted, it would seem to be nothing more nor less than his duty to make an investigation.

The weakness of relator's contention is further illustrated by the preceding clause of the same section which expressly

prohibits the registration of a trade-mark, which is not law-fully used in foreign commerce, or which is identical with a registered or known trade-mark of another, or which so closely resembles some other person's lawful trade-mark as to be likely to cause confusion or mistake in the mind of the public, or to deceive purchasers.

If Congress had intended to make the duty of the Com-missioner, where the application is uncontested, ministerial only, it would seem that, instead of requiring him to ·deny registration if certain facts appeared, it would have com-manded him to issue the certificate without question upon the presentation of the verified application.

Counsel for relator admitted, on the argument, that it has been the custom of the successive Commissioners to keep in the office, as far as practicable, all trade-marks in use that have not been registered, for the purpose of comparison with those presented for registration, and to deny registra-tion when it was apparent that the applicant had adopted one of these known trade-marks, or a deceptive imitation thereof, even though the owner of the same made no appear-ance and entered no objection; nor would they deny that it was his duty to do so.

The Commissioner being, as we have seen, required to deny registration where the alleged trade-mark is the coun-terfeit or deceptive resemblance of another, or where it is not lawfully used in commerce with foreign nations or the Indian tribes, how is he then to discover this counterfeit, or unlawfulness of use, if he is not authorized to look beyond the application and verified statement, and determine, *aliunde*, the rightfulness of the claim to registration?

Suppose an application is presented to the Commissioner, the allegations of which he knows to be untrue, is he, not-withstanding this knowledge, to register the falsehood and give presumptive lawfulness to the fraud? For example, the application in this case (inadvertently, of course, and probably through following a printed form), states that this trade-mark is used in commerce with the Indian tribes as well

as with Canada. Now suppose this application had stated solely that the trade-mark applied for was used in commerce with the Indian tribes, would the Commissioner be bound to register it, notwithstanding the laws of the United States expressly prohibit commerce in liquors with these tribes? Suppose the laws of Canada, in which, as evidence of commerce, it was shown, a case of the liquors stamped with this trade-mark had been sold, should be found to prohibit the importation of liquors, or the sale thereof within her territorial limits, would the Commissioner be compelled to disregard the fact and abet the violation of the laws of a friendly nation, by registering the trade-mark?

If a private corporation, through its president, should apply for the registration of a trade-mark with due formality, and the Commissioner, upon examination, should find that it was prohibited by law from carrying on commerce outside of the State of its creation, would he be required to ignore this knowledge and give effect to the unlawful use of the trade-mark by the corporate agents?

In this case, the State of South Carolina presented a copy of its Dispensary Act to the Commissioner as the authority of the State Board of Control for selling a case of the State's liquors in Canada. The Commissioner, upon inspection of the law, concluded that by its terms the State was confined exclusively to the sale of liquors within her own limits, and that her officers had no power to carry on commerce in liquors in her name with Canada or any other foreign nation. Grant that his decision on this and other points was erroneous; still, the construction of these laws was a matter submitted to his discretion, and for the exercise thereof he is not responsible to the judicial power.

That the action of the head of a department in construing a law for his guidance is not subject to revision by mandamus was expressly ruled in *Decatur* v. *Paulding*, 14 Pet., 497, where Taney, C. J., speaking for the court, said:

" The duty required by the resolution was to be performed by him (the Secretary of the Navy) as the head of one of the

executive departments of the government, in the ordinary discharge of his official duties. In general, such duties, whether imposed by act of Congress or by resolution, are not mere ministerial duties. The head of an executive department of the government, in the administration of the various and important concerns of his office, is continually required to exercise judgment and discretion. He must exercise his judgment in expounding the laws and resolutions of Congress, under which he is from time to time required to act. If he doubts, he has a right to call on the Attorney-General to assist him with his counsel; and it would be difficult to imagine why a legal adviser was provided by law for the heads of the departments as well as for the President, unless their duties were regarded as executive, in which judgment and discretion were to be exercised. If a suit should come before this court, which involved the construction of any of these laws, the court certainly would not be bound to adopt the construction given by the head of a department. And if they supposed his judgment to be wrong they would, of course, so pronounce their judgment. But their judgment upon the construction of a law must be given in a case in which they have jurisdiction, and in which it is their duty to interpret the act of Congress, in order to ascertain the rights of the parties in the cause before them. The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise discretion or judgment, nor can it, by mandamus, act directly upon the officer, and guide or control his judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties. The case before us illustrates these principles and shows the difference between executive and ministerial acts."

In that case the widow of Commodore Decatur claimed and received a pension under a general act of Congress, and claimed another under the provisions of a special resolution for her benefit. There was no dispute over the facts. The Secretary, under his construction of the law, denied the pen-

sion, and the court refused the mandamus. What is said in that case of the Secretary applies equally to the Commis-. sioner of Patents, who is at the head of a department.

In *U. S., ex rel. Dunlap* v. *Black*, which we have cited above, mandamus to the Commissioner of Pensions was applied for. The relator, through ignorance or misapprehension, made application for a pension under the act of 1877, and was rated at thirty-six dollars per month, when his disabilities were such as clearly to entitle him, had he applied under the act of 1874, to fifty dollars per month. By the act of 1880, it was provided that all those at the date of the act receiving pensions at fifty dollars per month, as provided in the act of 1874, should receive seventy-two dollars per month from January 17, 1878. Relator's application for this increase was denied, but he was then placed on the roll under the act of 1874, entitling him to fifty dollars per month. The Commissioner denied his claim on the technical ground that, not having been actually rated under the act of 1874, he was not entitled to the benefit of the act of 1880, though he found that "the degree of helplessness which has been shown was that contemplated by the law." The Supreme Court of the District of Columbia refused to issue the mandamus, and on writ of error their judgment was affirmed. After quoting from *Decatur* v. *Paulding*, the passage quoted herein above, and laying down the rule deducible from that case, and *Kendall* v. *Stokes*, 12 Pet., 524, Bradley, Justice, said:

"Judged by this rule the present case presents no difficulty. The Commissioner of Pensions did not refuse to act or decide. He did act and decide. He adopted an interpretation of the law adverse to the relator, and his decision was confirmed by the Secretary of the Interior as evidenced by his signature of the certificate." (This confirmation, however, had nothing to do with the question, for if the Commissioner's act was ministerial, his was necessarily so too.) " Whether, if the law were properly before us for consideration, we should be of the same opinion, or of a different

opinion, is of no consequence in the decision of this case. We have no appellate power over the Commissioner; and no right to revise his decision. That decision and his action taken thereon were made and done in the exercise of his official functions. They were by no means merely ministerial."

The case at bar, in our opinion, presents a stronger case for the denial of the writ than either *Decatur* v. *Paulding*, or *U. S.* v. *Black*, or the recent case of *Redfield* v. *Windom*, 137 U. S., 636, in each of which it was denied.

There are only three cases in the Supreme Court, to which our attention has been called, where the mandamus has been ordered:

(1.) *Kendall* v. *Stokes*, 12 Pet., 524. In this case the law required the Postmaster General to enter to the credit of a contractor such sum as the solicitor should report to him for that purpose. There was no possible room for the exercise of discretion.

(2.) *Butterworth* v. *Hoe*, 112 U. S., 50. Here the Commissioner of Patents found all the facts in favor of the applicant and ordered a patent to issue. An appeal was taken to the Secretary of the Interior, who reversed him. In deference to this decision, the Commissioner withheld the patent. It was held that the Secretary had no jurisdiction over the Commissioner's decisions, and as the Commissioner had already determined every question in favor of the applicant, nothing remained to be done but to deliver the patent, which was a purely ministerial act.

(3.) *U. S.* v. *Schurz*, 102 U. S., 378. In this case a patent to land had been made out and signed and only lacked delivery. *Held*, that applicant's right had been settled, and he was entitled to the possession.

To these may be added *Marbury* v. *Madison*, 1 Cr., 137, in which the court apparently would have issued the writ had it not found itself without jurisdiction. Marbury had been appointed to an office by President Adams; the Senate had confirmed him; his commission had been made out and signed by the President, and nothing remained to be done

beyond its delivery. There is no similarity between the facts of those cases and of this. The distinction is plain and unmistakable.

We are clearly of the opinion that the duties imposed upon the Commissioner of Patents by the Trade-mark Act are not ministerial, but that their proper discharge requires the exercise of judgment and discretion, and that therefore his action cannot be controlled by this proceeding.

In view of the suggestion by counsel that applications for other trade-marks on behalf of the relator are waiting presentation upon the decision of this case; and because from what has been said we may have created the impression that we deem the decision of the Commissioner to the effect that the State could not engage in foreign commerce erroneous; and as the question has been fully argued, we will express ourselves briefly on the second proposition, though its decision is not absolutely necessary.

It would seem to be the practice of those who desire the registration of newly-adopted trade-marks, to ship a package of merchandise labeled therewith to some foreign country, and upon its sale there to base the affidavit that the same is used in foreign commerce. Whether an isolated case of such consignment and sale would constitute commerce with a foreign nation within the meaning of the law is a question which was not argued, and we will pass it by without decision, assuming, for the purpose of this case only, that it would.

The power of the State of South Carolina to engage in foreign commerce for the purpose of revenue or profit, through an express act of her legislature, is a question that we are not called upon to decide. We do hold, however, that the executive officers of the State cannot engage her in trade without the express authority of the legislature, and we do not understand that this power is seriously claimed. The Dispensary law, which was enacted December 24, 1892, and took effect July 1, 1893, clearly has its foundation in an attempt to exercise the police power of the State for the prevention of the evils which attend the indiscriminate sale

of intoxicating liquors; the collection of revenue is an incidental feature thereof. If the expressed object of the law were the making of profit through trade in liquors, and the suppression of the evils of private traffic therein were only an incident, the question would be presented, whether the legislature of a State, without express constitutional authority, has the power to collect money, by the exercise of its sovereign power of taxation, for the purpose of using it in ordinary trade with the view to prospective profit. If such were the question we would have no hesitation in saying that no such power exists.

The constitution of South Carolina provides that "Every act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title." The title of the Dispensary Act is: "An act to prohibit the manufacture and sale of intoxicating liquors as a beverage within this State except as herein permitted." It would be an unnecessary consumption of time to undertake a synopsis even of this lengthy act. We can find nothing whatever in it to justify an inference that it was intended to give authority for trade in liquors outside the limits of the State. Every part of it relates exclusively to sales, as expressed in the title, "within this State." The State Commissioner is required to purchase the liquors for sale in the State, and to put them upon the market through the county dispensers, under the most stringent regulations to prevent abuse. If a non-resident should desire to buy any of the State's liquor, he cannot order it sent to him by the commissioner or one of the dispensers. By a strained and doubtful construction he might procure it through some resident agent, who might possibly be allowed to make the necessary sworn application, procure a limited quantity of the liquor, and then as his own act ship it to his principal. But this, if permissible at all, would hardly constitute foreign or interstate trade in the article.

If then, as seems to have been proved before the Comsissioner, a case of the State's liquors was sent to Canada and sold there by the State commissioner, it was not au-

thorized by the law, and was not the act of the State but of the officer. This distinction between the acts of the State and the acts of its officers without the authority of a valid law, is clearly stated in the able opinion of Lamar, Justice, speaking for the court in *Pennoyer* v. *McConnaughy*, 140 U. S., 1.

The Commissioner did not err in the conclusion that the trade-mark applied for had not been lawfully used in foreign commerce.

*It follows from what has been said that the judgment appealed from should be reversed, and the relator's petition dismissed, and it is so ordered.*

(NOTE.—This case was taken to the Supreme Court of the United States by writ of error, and was by that court, on May 14, 1894, on motion of the appellee, the Commissioner of Patents, dismissed for want of jurisdiction.—*Reporter.*)